DECISION
Defendant-appellant/cross-appellee, Robert T. Farley, Jr., appeals from two separate judgments of the Franklin County Court of Common Pleas, Division of Domestic Relations, both arising out of the divorce action between appellant and plaintiff-appellee/cross-appellant, Barbara J. Farley. In case No. 99AP-1103, Mr. Farley appeals and Mrs. Farley cross-appeals from various aspects of the judgment entry and decree of divorce entered by the trial court governing disposition and division of marital property. In case No. 99AP-1282, Mr. Farley appeals from the court's ruling on post-decree motions filed by Mrs. Farley, finding him guilty of contempt for non-compliance with certain aspects of the decree, sentencing him to thirty days incarceration with twenty days suspended, and affording him the opportunity to purge his contempt by complying with the terms of the divorce decree. The cases have been consolidated in this court for briefing, argument, and decision.
The parties were married in 1957. Two children were born of the marriage, both of whom were emancipated at times pertinent to the present case. Mrs. Farley appears to have been a homemaker from the outset of the marriage, and to have foregone an outside career. In 1966, Mr. Farley founded Farley Paving, an asphalt contracting company. For a time the company thrived and provided the couple with a substantial income, which they invested in a number of commercial and residential real estate properties. The most valuable of these was a seven-acre tract on Fisher Road in Franklin County where the paving business was based. Mr. Farley managed the rental properties himself, doing business as the R.T. Farley Company, a sole proprietorship.
The poor economic climate of the 1970s and early 1980s contributed to a decline in the paving business, and by 1983 Farley Paving was no longer active. Mr. Farley then began a second business, Farley Equipment, for the purpose of acquiring, rehabilitating and marketing used construction equipment, including disposing of the equipment owned by Farley Paving. This business was not successful, and incurred substantial debt under a line of credit with Bank One. The rental real estate owned by the couple and managed by the R.T. Farley Company, however, including the Fisher Road site formerly occupied by Farley Paving, although encumbered with some debt, retained substantial equity.
During the time the family businesses were failing, the couple's marriage also declined. By 1981, the parties were discussing divorce in an exchange of letters. In 1984, the parties permanently separated and discussed a dissolution of their marriage. At this time, Mr. Farley prepared a "separation agreement," which, by its own terms, was "not a legal or binding agreement." The parties moved out of the marital home and sold it to their daughter, and each purchased a separate home. They divided their furniture and personal belongings, and discussed final property division of their investments and rental properties. Mr. Farley, however, expressed at this time, and repeatedly over the years until Mrs. Farley finally filed for divorce, the firm belief that, in light of the difficult economic climate and the debt incurred in connection with Farley Paving and Farley Equipment, it was inadvisable to rush the liquidation and separation of the real estate properties.
Although the parties appear to have led entirely separate social, romantic and day-to-day lives after the separation, and indeed for some time before it, their finances remained intimately entangled because of their common interests in the investment properties. Over the twelve years following their separation in 1984, the parties maintained this fragile status quo, balancing the competing interests of Mr. Farley, who wished to avoid hasty liquidation of the real estate with consequent loss in value (and who was earning his livelihood from management of the properties) with Mrs. Farley's periodically expressed desire to terminate both their marriage and their financial entanglement. During this period, Mr. Farley paid Mrs. Farley substantial support, both cash and in-kind, paying for certain of her bills and at times furnishing her with an automobile. During this period, Mr. Farley paid down substantial indebtedness associated with the defunct paving and equipment companies and with the investment properties. There is no dispute that the net equity in the real estate properties increased substantially from 1984 to 1996. Mr. Farley also accumulated substantial amounts in mutual fund investments beginning in 1992.
Mrs. Farley filed her complaint for divorce on November 26, 1996. On her motion the court promptly issued restraining orders prohibiting Mr. Farley from spending or liquidating various assets. A subsequent entry ordered Mr. Farley to pay $300 per month in attorney fees to Mrs. Farley but there was no order of temporary spousal support in the case.
The matter came to trial on April 14, 1999. The court heard extensive testimony from both parties regarding their finances both prior to and after their separation in 1984. Mrs. Farley also testified at length about alleged abuse by Mr. Farley prior to their separation. Mr. Farley testified as to the financial situation of the couple's investment property in 1984 as well as his ability to generate income from the property for both his own and Mrs. Farley's support, as well as to pay down debt incurred both in acquisition and management of the commercial properties and from the now-inactive Farley Equipment and Farley Paving businesses. The parties stipulated to the individual values of the eleven different investment properties, setting a total stipulated value of $3,808,100. Mr. Farley also testified regarding a potentially significant but as-yet unquantifiable liability to be offset against the market value of the two parcels comprising the Fisher Road complex, based on the presence of several buried underground tanks and asphalt dumps on the property, which might require removal and environmental remediation before a sale.
The court issued its judgment entry and decree of divorce on September 10, 1999. In the decree, the court found the duration of the marriage to be from April 15, 1957, to April 13, 1999. The court ordered that the investment real estate be sold and the net equity, after transaction and remediation expenses, be shared equally between the parties. The court excepted the individual residences and personal possessions of the parties from the marital estate, but ordered the parties' mutual funds and life insurance cash values be equally divided. The court did not grant Mrs. Farley's request that Mr. Farley be found in contempt of court for disbursing funds from certain of his money market accounts, but nonetheless found the withdrawals to violate the restraining order protecting marital assets. The court thus ordered Mr. Farley to pay $45,160 as an offset, to compensate Mrs. Farley for her share of the mutual funds expended by him prior to the April 13, 1999 termination date of the marriage. Mr. Farley was ordered to continue to manage the real estate properties until sales could be effectuated. He was to remain entitled to retain the rental income and tax benefits from the properties, with the concurrent obligation to maintain the properties to preserve their market value.
The court set spousal support payable by Mr. Farley to Mrs. Farley in the amount of $1,500 per month to terminate upon the death of either party, the remarriage of Mrs. Farley, or the completion of the sale and distribution of at least fifty percent of the joint marital investment real estate. The court defined fifty percent of the property as either sale of the Fisher Road complex or sale of five of the nine remaining properties.[1]
The court further ordered Mr. Farley to pay Mrs. Farley attorney fees in the sum of $30,000 within thirty days of the judgement.
Mrs. Farley subsequently filed two motions to show cause seeking to have Mr. Farley held in contempt for failing to transfer half the mutual fund investments to Mrs. Farley and failing to pay her attorney fees of $30,000 as ordered by the court. Mr. Farley contemporaneously filed a motion for stay of the court's final judgment pending appeal. The motion for stay and motions to show cause were heard on November 2, 1999, and the court granted Mr. Farley's request for a stay pending appeal conditioned upon a bond of $1.7 million. The court then considered Mrs. Farley's motions to show cause, overruled Mr. Farley's motion to dismiss for lack of proper service, and found him in contempt for failure to comply with the terms of the final judgment entry and decree of divorce.
In case No. 99AP-1282, Mr. Farley has appealed from the trial court's judgment finding him in contempt and brings the following assignment of error:
 The trial court erred in holding Appellant in contempt of court.
In case No. 99AP-1103, Mr. Farley has appealed various aspects of the trial court's final judgment entry and decree of divorce, bringing the following six assignments of error:
FIRST ASSIGNMENT OF ERROR
THE TRIAL COURT ERRED IN FAILING TO FIND A DE FACTO TERMINATION OF MARRIAGE IN 1984 AND IN FAILING TO VALUE THE MARITAL ASSETS AND LIABILITIES AS OF THAT DATE.
 SECOND ASSIGNMENT OF ERROR
THE TRIAL COURT ERRED IN FAILING TO EQUITABLY DIVIDE THE DEBTS AND CAPITAL GAIN TAX LIABILITIES OF THE PARTIES.
 THIRD ASSIGNMENT OF ERROR
THE TRIAL COURT ERRED IN AWARDING AN OFFSET OF $45,160 TO PLAINTIFF FROM DEFENDANT'S MUTUAL FUNDS.
 FOURTH ASSIGNMENT OF ERROR
THE TRIAL COURT ERRED BY ORDERING THE LIQUIDATION OF THE RENTAL REAL ESTATE.
 FIFTH ASSIGNMENT OF ERROR
THE TRIAL COURT ERRED BY FAILING TO EQUITABLY DIVIDE THE MARITAL ASSETS AND LIABILITIES OF THE PARTIES.
 SIXTH ASSIGNMENT OF ERROR
THE TRIAL COURT ERRED BY AWARDING ATTORNEYS FEES OF $30,000.
Mrs. Farley has cross-appealed from the trial court's final judgment entry and decree of divorce and brings the following five assignments of error:
ASSIGNMENT OF ERROR NO. 1
THE TRIAL COURT ABUSED ITS DISCRETION BY ORDERING ANY TERMINATION DATE FOR SPOUSAL SUPPORT; AND SPECIFICALLY, A TERMINATION DATE PREMISED UPON AN UNKNOWN AND ARBITRARY TIME FRAME.
ASSIGNMENT OF ERROR NO. 2
THE TRIAL COURT ABUSED ITS DISCRETION BY ORDERING AN INSUFFICIENT AMOUNT OF SPOUSAL SUPPORT AND ATTORNEY FEES TO THE CROSS-APPELLANT.
ASSIGNMENT OF ERROR NO. 3
THE TRIAL COURT ABUSED ITS DISCRETION BY FAILING TO AWARD INTEREST AND/OR INVESTMENT BENEFITS TO THE CROSS-APPELLANT ON ALL MONIES OWED TO HER BY THE CROSS-APPELLEE; AND, BY FAILING TO DELINEATE THE SEQUENCE OF THE RESTITUTION TO BE PAID TO HER.
ASSIGNMENT OF ERROR NO. 4
THE TRIAL COURT ABUSED ITS DISCRETION IN AWARDING THE ENTIRE VALUE OF FARLEY EQUIPMENT, INC. OR FARLEY PAVING CO. TO THE CROSS-APPELLEE.
ASSIGNMENT OF ERROR NO. 5
THE TRIAL COURT ABUSED ITS DISCRETION BY REQUIRING THE CROSS-APPELLANT TO EQUALLY SHARE IN ANY REMEDIATION COSTS FOR THE FISHER ROAD PROPERTY.
We will first address the contempt of court issues raised in case No. 99AP-1282. As set forth above, the trial court entered judgment on November 9, 1999, finding appellant guilty of contempt for failure to comply with provisions of the divorce decree requiring Mr. Farley to transfer half of the mutual fund shares to Mrs. Farley, and to pay her attorney fees of $30,000. In opposing the show-cause motions, counsel for Mr. Farley argued that the contempt motions had not been properly served on Mr. Farley, but had instead been served upon counsel for Mr. Farley. Counsel for Mrs. Farley countered that the court had continuing jurisdiction from the underlying divorce action, and that personal service of the contempt motions was not required. The trial court treated Mr. Farley's objection to the motions as a motion to dismiss, overruled it, and continued with the contempt hearing.
The general rule on the issue is clear: Civ.R. 75(J) requires that post-decree motions must be served pursuant to Civ.R. 4 to 4.6, which rules require service upon the defending party, rather than counsel:
 The continuing jurisdiction of the court shall be invoked by motion filed in the original action, notice of which shall be served in the manner provided for the service of process under Civil Rules 4 to 4.6.
Civ.R. 75(J). The issue before us is whether this general rule applied to deprive the court of jurisdiction in the contempt action, or whether the court retained jurisdiction, either on a theory of continuing jurisdiction from the underlying divorce action, or because Mr. Farley's contemporaneous motion for a stay of the decree pending the appeal vested the court with jurisdiction over him for purposes of contempt motions as well. Although this court has, as set forth below, expressed some ambivalence on the issue, we find that in the present case neither the continuing jurisdiction of the court nor Mr. Farley's motion for stay of judgment was sufficient to eliminate the need for personal service upon Mr. Farley as required in Civ.R. 75(J) and Civ.R. 4 to 4.6.
In the case of Hansen v. Hansen (Mar. 26, 1999), Hamilton App. No. C-971042, unreported, the court noted that the "unique nature of a contempt proceeding," and resultant heightened sensitivity to due process notions, made the personal service requirements of Civ.R. 75(J) in post-decree proceedings particularly important. The court accordingly found that service upon the contemnor's attorney was inadequate, and reversed. The court in Hansen acknowledged that the question had been, to that point, somewhat unsettled in Ohio law, but that the nature of contempt proceeding as "essentially a new and independent proceeding in that it involves new issues and must be initiated by the issuance and service of new process" justified personal service upon the alleged contemnor. Hansen, at 7. See, also,Hannaford v. Hannaford (Feb. 7, 1983), Montgomery App. CA7892, unreported: "[A]ppellee, by initiating contempt proceedings against appellant, was asserting a new and additional claim for relief, or remedy against him, namely a contempt order and possible jail term."
Applying the rule from Hansen, this court held inSweeney v. Sweeney (Sept. 17, 1998), Franklin App. No. 98AP-66, unreported, that the domestic relations court lacked jurisdiction to rule on a post-decree motion to amend child support absent perfected service upon the parties pursuant to Civ.R. 75(J):
 Where the requirements of service of process under Civ.R. 75(I) [sic as amended (J)] have not been met, the court is without jurisdiction to consider a motion to amend or modify a child support order. * * * Judgments rendered without obtaining personal jurisdiction pursuant to Civ.R. 75(I) are nullities void ab initio."
 Sweeney, at 3. As noted by appellee, however, this court in Kennedy v. Talley (Mar. 30, 1999), Franklin App. No. 98AP-893, unreported, was less than unanimous in following the rule inHansen under all circumstances. In Talley, as in the case before us, the party moving for contempt sought to establish jurisdiction based upon a contemporaneous post-decree motion by the contemnor. The lead opinion noted, "[a]ppellee's show cause motion arose out of some of the same issues presented by appellant's * * * motion." The lead opinion concluded that the jurisdiction of the court was therefore invoked by the contemnor, and personal service upon him of the show-cause motion was not required. Talley, at 4. We must note, however, that Talley is an anomaly from a precedential point of view, because two members of the three-judge panel concurred separately, disagreeing with the lead opinion's conclusion that personal service on the contemnor was not necessary, but concurring in other issues and the final outcome of the appeal. If anything, Talley therefore stands for the proposition that Hansen
properly states the law on this issue. Furthermore, we find the facts in Talley to be distinguishable on the basis of the nature of the contemporaneous motion by the contemnor, which in Talley
was a motion to modify child support, as opposed to the motion for a stay in the present case, which did not seek to reopen the issues underlying the contempt finding, but merely to stay enforcement of the decree pending appeal. If the lead opinion inTalley were universally applied to actions arising in the domestic relations court, personal service under Civ.R. 75(J) of show-cause motions would become unnecessary in every case in which an appeal was taken and a stay sought. Clearly, this would be an overbroad exception to the general rule of personal service set forth in Hansen and Civ.R. 75(J). Moreover, Talley was decided at least partly upon the contemnor's failure to raise the issue before the trial court at all: "appellant submitted himself to the trial court's jurisdiction by appearing and defending the action" without objection. Talley, at 4.
Based upon the foregoing, we find that pursuant to Civ.R.75(J) and Civ.R. 4 to 4.6, service of the show-cause motions upon Mr. Farley's counsel was inadequate to establish jurisdiction in the trial court to support a contempt finding against Mr. Farley, and his assignment of error in case No. 99AP-1282 accordingly has merit and is sustained. The trial court's finding of contempt will accordingly be reversed.
In case No. 99AP-1103, Mr. Farley's first assignment of error asserts that the trial court erred in failing to find that the parties' marriage was de facto terminated when the parties separated in 1984, rather than as of the first day of trial in 1999.
In cases such as the present one, involving lengthy separations prior to legal termination of the marriage, a domestic relations court is empowered to select an equitable date of defacto termination of the marriage to govern division of marital property in instances where division of property as of the date of trial would be inequitable. R.C. 3105.171(A)(2)(b); Berish v.Berish (1982), 69 Ohio St.2d 318. The trial court's determination of the appropriate date will not be reversed on appeal absent an abuse of discretion by the trial court. Gullia v. Gullia (1994),93 Ohio App.3d 653, 666. This court has, however, found such an abuse of discretion in instances where the record unequivocally indicates "a clear and bilateral breakdown of the marriage prior to the hearing date," and the trial court nonetheless failed to set an earlier de facto termination date for the marriage. Crowerv. Crower (Aug. 5, 1999), Franklin App. No. 98AP-1124, unreported, at 14. "An alternative valuation date should be employed when the totality of the circumstances and equitable considerations between the parties demonstrate that there was a clear and bilateral breakdown of the marriage and the parties have ceased contributing to each other for each other's benefit as would partners in a shared enterprise or joint undertaking."Rogers v. Rogers (Sept. 2, 1997), Franklin App. No. 96AP-1333, unreported, at 19.
Mr. Farley argues that the facts support a finding that a de facto termination of the marriage occurred at the time of separation in 1984. Mr. Farley points out, and the record supports, that the parties did not share society, companionship, comfort, love, solace or sexual relations after 1984 and kept many aspects of their personal finances separate. These included separate bank accounts, credit cards, retirement plans, life insurance policies, and the title to their respective personal residences.
Mr. Farley also stresses that the parties executed a separation agreement in 1984, and cites Day v. Day (1988),40 Ohio App.3d 155, for the proposition that execution of such an agreement is evidence of clear and bilateral termination of a marriage.
The arguments advanced by Mr. Farley, in the ambivalent factual context of this case, certainly present a colorable argument supporting de facto termination of the parties' marriage in 1984; however, there is more compelling evidence supporting the trial court's determination that the 1999 date should be used for equitable division of marital assets. The trial court aptly summed up the situation:
 This is not a case in which the parties mutually decide to split up and then move on with their completely separate lives until one of them ten or twenty years later gets around to finally filing for divorce * * *. In that scenario, while a long delay in the actual legal filing might be similar to the within action, the intent to live completely separate lives with little or no communication would be distinguishable to the cases at hand. In those cases, which the court sees on a fairly frequent basis, it is equitable to terminate the marriage as of the date the parties separated; and the within action, however, it is not.
(Sept. 10, 1999 dec., at 6-7.) The trial court was particularly swayed by the complex, ongoing financial entanglement between the parties largely created by Mr. Farley's reluctance to liquidate the rental properties or otherwise raise cash to effectuate a settlement with Mrs. Farley after 1984. As noted by the trial court, it was not until twelve years after the separation that either party filed for divorce, and in fact it was at that time Mrs. Farley did file, over continuing protests from her husband regarding the economic consequences of doing so, as demonstrated in this excerpt from a lengthy letter from Mr. Farley to his wife, dated November 19, 1996:
 I had a carefully developed economic plan that would eventually work to the benefit of everyone. You are/were familiar with it, but you are in a hurry for faster results than I can produce. Your plan [divorce] will destroy my plan.
The voluminous correspondence between Mr. Farley and Mrs. Farley is found in the record and contains ample evidence of Mr. Farley's obstinate reluctance to cut the economic cords that bound the couple. From the point of view purely of maximizing the value of the rental properties, the financial benefits to both parties of postponing liquidation might be understandable. It is also apparent from the record, however, that Mr. Farley benefited far more than Mrs. Farley from postponement of a final financial settlement. During the period of separation, he paid support to Mrs. Farley in amounts which are, if disputed, certainly not negligible. These funds, however, were generated from the income stream produced by the investment properties, and he manifestly benefited to a far greater extent since he received a much higher income during this period and in fact lived exclusively from the rental income, having no other ongoing businesses or employment after the failure of Farley Equipment.
"De facto termination" is an equitable form of relief, an exception to the general rule that termination of a marriage will follow the legal formalities associated therewith. Langer v.Langer (1997), 127 Ohio App.3d 348, 355. It is of course a fundamental rule of equity that he who seeks equity should come to equity with clean hands, and that he who seeks equity must do equity. Klaustemeyer v. Cleveland (1913), 89 Ohio St. 142. In the present case, Mr. Farley seeks to retain for himself entirely the increase in net value in the rental properties, as well as various non-real estate investments accrued by him over the years from the income stream generated by the properties. It would be clearly inequitable to allow him to benefit exclusively from the advantages posed by the delay in termination of the marriage, a delay which he steadfastly insisted his wife accept on those occasions during their separation where she sought a complete settlement of their financial affairs. The increase in net worth of the marital assets, through appreciation and elimination of debt, is therefore due to as much to Mrs. Farley's forbearance from imposing an immediate settlement as to Mr. Farley's reluctance to effectuate one. In addition, Mr. Farley has derived a substantial income, in fact a multiple of the support paid in various forms to Mrs. Farley, over the course of years through his management of the properties. Some of this certainly represents the sweat of Mr. Farley's brow; the balance represents, just as certainly, the foregone investment income which might otherwise have accrued to Mrs. Farley had she been allowed to realize her interest in the real estate pursuant to a property division in 1984.
On these facts, even without recourse to the other factors cited by the trial court (including Mr. Farley's often meddlesome and controlling attitude towards his estranged wife, the filing of joint tax returns, and the non-binding nature of the separation agreement), we find that there was no abuse of discretion by the trial court in setting the termination date as the first day of trial in 1999. Mr. Farley, having asserted to Mrs. Farley for years that the prolongation of the parties' marriage would advantage both, cannot now assert that only he should reap that benefit. The trial court accordingly did not err in setting the termination date for valuation and division of the parties' assets as the first day of trial in 1999. Mr. Farley's first assignment of error is accordingly overruled.
Mr. Farley's second assignment of error asserts that the trial court erred in failing to equitably divide the debts and capital gains tax liabilities of the parties. The trial court's decision ordered Mr. Farley to dispose of all eleven real estate income properties and equally divide the proceeds between the parties. The trial court noted that buy-out or in-kind division proposals advanced by the parties were impracticable in light of the age of the parties, the disparate values of various parcels, and the as-yet unquantifiable encumbrance of the Fisher Road property represented by possible environmental remediation costs which would be triggered by a sale. The trial court thus ordered the sale of all properties and division of the net equity, after "costs of sale * * *. [A]ny required remediation costs shall be divided equally." The court further ordered Mr. Farley to continue to manage the properties until their sale, retaining the rental income and mortgage deductions but with a corresponding obligation to pay the mortgages and upkeep, including repairs, liens, taxes, insurance and other expenses. The court's order does not address the capital gain tax consequences of the property sales, which Mr. Farley asserts would primarily be borne by him. Mr. Farley also asserts that the trial court's decision, which ordered that the net proceeds of the properties after subtraction of associated debt, remediation expenses, and transaction costs, be divided between the parties, does not address the division of a $130,000 balance on an unsecured note issued by Bank One, the proceeds of which were, according to Mr. Farley, used to develop the Fisher Road complex.
It is clear from the totality of the trial court's decision that the court wished to award to each respective party his or her personal residence, possessions, and related mortgage or consumer debt representing those aspects of the parties' lives which had remained entirely distinct after separation. In contrast, the court clearly intended to divide equally the investment properties as they existed in 1984, and traceable assets and accumulated wealth devolving therefrom. This is reflected in the final catch-all provision made by the court for division of assets: "Further, any other assets not herein specifically delineated shall be divided 50% to each party as of the value on April 13, 1999." (Trial Court Decision at 12.)
Mr. Farley claims that, due to the lengthy holding period for many of the investment properties, very substantial capital gains tax, as high as $600,000 by his accountant-expert's estimate, may be due upon disposition of the properties. Since the bulk of the properties are in his name alone, he contends that the federal capital gain tax burden will fall entirely upon him, disproportionately reducing his share of the proceeds of the liquidated properties.
Mrs. Farley counters by asserting that any attempt to anticipate the capital gains tax consequences of the property division and sale is too speculative and could not with certainty be anticipated and addressed in the trial court decision. She points out that the parties' respective tax situations, including offsetting capital losses, current and future tax law changes, setoffs or deductions, and future earned income, cannot now be ascertained, since disposition of the properties may take several years. Mrs. Farley thus argues that the tax consequences of the property division are excessively speculative and should not be addressed or anticipated by the trial court. James v. James
(1995), 101 Ohio App.3d 668, 688; Day, supra.
While we agree with Mrs. Farley that the exact amount and tax consequences to each party of the capital gains realized from the sale of the properties cannot be reliably ascertained in advance, the one fact which is not speculative is that a very large capital gains tax burden may be incurred by Mr. Farley upon realization of the accrued gains in the properties. The sheer size of this potential liability, in relation to the appraised net values of the properties in question, runs counter to the trial court's general tendency in the present case to divide the investment property equally. While Mrs. Farley argues that the trial court simply intended for this burden to fall upon Mr. Farley, perhaps as an offset for his ability to derive income from the properties during the considerable time which he exercised sole control over them, this runs counter to the general trend of the trial court's decision, and if the trial court indeed intended for the tax burden to fall disproportionately on Mr. Farley, specific intent to do so should have been stated. In light of the large sums involved, we find that additional development and clarification of this issue on the part of the trial court is required, and thus remand on this issue is necessary.
With respect to the $130,000 balance on the unsecured line of credit in Mr. Farley's name, which he asserts was related to improvement and management of the Fisher Road property, we are also unable to determine with certainty the intentions of the trial court. The court's intention, clearly, was to leave each party responsible for their own day-to-day expenses and indebtedness, including personal residences, mortgages, automobile loans, and credit card debt. Equally certain is that the trial court intended for debt incurred in the operation, upkeep and management of the investment properties to be offset against the gross proceeds from the sale of those properties. The $130,000 balance of the line of credit appears to fall somewhere between these two categories; although Mr. Farley traces the funds to necessary improvement on the Fisher Road property, it is also apparent that he drew liberally from the income stream and profits of the corpus of the investment properties and this indebtedness might well be balanced by withdrawals made elsewhere by Mr. Farley. The debt may also relate exclusively to the now-defunct paving and equipment businesses, whose residual value was allocated entirely to Mr. Farley in the property division. The state of the evidence in the present case does not allow us to ascertain either the trial court's intentions with respect to the balance on the line of credit nor to make an equitable determination in respect thereto. This issue shall also be considered by the trial court upon remand.
In summary, we find that the trial court erred in not explicitly allocating between the parties the tax burdens resulting from capital gains from sale of the investment properties and in failing to allocate as either personal debt or investment property debt the $130,000 balance on the Bank One line of credit. Mr. Farley's second assignment of error accordingly has merit and is sustained.
Mr. Farley's third assignment of error asserts that the trial court erred in awarding an offset of $45,160 to Mrs. Farley representing one-half of certain withdrawals made by Mr. Farley from his mutual fund investments.
The trial court decision found that Mr. Farley had started contributing to mutual funds from his income in 1991. The trial court also noted that Mrs. Farley, after separation, was able to contribute in lesser amounts to bank CD's, an IRA account, and a life insurance policy. The trial court held that assets of this nature belonging to both parties would be divided equally based upon the 1999 termination date of the marriage. The court further found that Mr. Farley, after issuance of a restraining order upon commencement of the divorce action in 1996, which prohibited him from withdrawing from his mutual funds, had withdrawn a total of $90,320 from certain money market accounts, and that Mrs. Farley was due a setoff of one-half this amount, or $45,160.
Mr. Farley argues upon appeal that it was his regular business practice to accumulate income from the rental properties in money market funds, thus earning income while retaining liquidity, and to spend down the money market balances at the end of the year in satisfaction of taxes and other accumulated business expenses. Appellant argues that the court, in essence, valued the bulk of the marital assets as of April 1999, but chose to reach back for a higher valuation of the money market accounts as of December 1996, when Mrs. Farley filed for divorce, giving her the benefit of inconsistent valuation dates.
It is apparent from the trial court decision that the trial court valued the money market accounts as of the time of the issuance of the restraining order, despite its specific finding that Mr. Farley should not be held in contempt for his withdrawal from the money market accounts, because to do otherwise would have created the inequitable result of Mr. Farley unilaterally taking substantial marital assets, subject to a restraining order, to the detriment of the value of the divisible marital estate. While the trial court gave him the benefit of the doubt with respect to a finding of actual contempt, finding that he believed that he could properly withdraw funds from the accounts, the trial court determined that he had done so in contravention of the restraining order intended to preserve certain assets and prevent manipulation of the marital estate to his benefit by Mr. Farley. In Berish,supra, similar alternative valuation dates were allowed precisely to prevent the risk of this type of conduct. The trial court's determination, moreover, reflects the general state of the evidence in the record that between 1991 and 1996 when Mr. Farley accumulated very substantial sums in his mutual fund and money market investments, and after initiation of the divorce action tended, to the contrary, to draw down upon these funds. Since his tax returns and other financial documents indicate no corresponding decrease in income from the rental properties, or increase in expenses associated therewith, at least not of this magnitude, the trial court could properly determine that the valuation of the mutual funds as of 1996 was the proper measure for subsequent division in 1999. Mr. Farley's third assignment of error is accordingly overruled.
Mr. Farley's fourth assignment of error asserts that the trial court's order to immediately undertake liquidation of all the real property, with the exception of the parties' personal residences, it is economically undesirable and in fact was not requested by either party. He also asserts that wholesale liquidation of the real estate holdings will incur large transaction costs and trigger substantial capital gains taxes and recapture of accumulated appreciation. Mr. Farley also points out that the potential environmental liability associated with the Fisher Road complex, which parcels may represent nearly two-thirds of the total value of the real estate, would be best deferred as long as possible in light of the current economic benefits derived from the property in its present state of ownership and use.
R.C. 3105.171(F)(5) requires a domestic relations court to consider "the economic desirability of retaining intact an asset or an interest in an asset" before ordering its liquidation. This is only one of the factors enumerated in R.C. 3105.171, however, and the court is also required to consider, by implication, the equitable consequences of failure to liquidate the asset. In the present case, there is ample evidence supporting the trial court's decision that liquidation was the only desirable course of action, even given the costs associated therewith. The court noted that, given the age of the parties, the long term payout proposed by Mrs. Farley was unrealistic. It is also apparent that the court had before it no proposal from Mr. Farley which would have allowed anything near an equal division of the value of the properties. As part of the voluminous record of correspondence from Mr. Farley to Mrs. Farley prior to their separation, there were, written statements by Mr. Farley indicating that his age, poor health, and loss of enthusiasm for the property management enterprise meant that continued oversight of the rental properties was becoming "too much" for him and he could not go on much longer.
The trial court is vested with broad discretion in dividing the marital assets. Middendorf v. Middendorf (1998),82 Ohio St.3d 397, 401, which will not be disturbed on appeal absent an abuse of discretion. Id. The term "abuse of discretion" connotes more than a mere error in judgment, it means that the trial court's attitude is unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.Considering R.C. 3105.171(J), the totality of the circumstances regarding division of marital property may require sale of an asset even where some undesirable or negative factors are associated with immediate sale. Wylie v. Wylie (June 4, 1996), Lawrence App. No. 95CA-18, unreported. Given the complex circumstances rendering any other division of property difficult, Mr. Farley's expressed reluctance to continue managing the properties personally, and some evidence in the record that Mrs. Farley might not receive an equitable share of income and benefits from the properties if the status quo were preserved, the trial court's order that the properties be liquidated was not an abuse of discretion. Mr. Farley's fourth assignment of error is accordingly overruled.
Mr. Farley's fifth assignment of error asserts that the trial court erred in failing to equitably divide the marital assets and liabilities of the parties. Mr. Farley argues that the trial court's equal division does not recognize his separate contribution to the property. Mr. Farley asserts that he is entitled to more than one-half of the proceeds of the sale of the real estate on the basis that he managed the rental properties, managed the winding-down of the paving and equipment businesses, undertook and personally guaranteed some of the financing in connection with the properties, and in sum increased the net value of the real estate holdings from approximately $2,239,000 in 1984 to $3,099,000 in 1998. During this time, drawing upon the income generated from his management of the properties, Mr. Farley also paid down a $1,100,000 note related to the equipment company to approximately $130,000. He asserts that his "great personal sacrifice" in these accomplishments should entitle him to a greater share of the assets, and that he should be given credit for the money amounts he paid to Mrs. Farley over the course of their separation as direct or in-kind support. Again, our standard when reviewing a division of marital assets by a trial court is that we must "view the property division in its entirety, consider the totality of the circumstances, and determine whether the property division reflects an unreasonable, arbitrary or unconscionable attitude on the part of the domestic relations court." Jelen v. Jelen (1993), 86 Ohio App.3d 199, 203.
It is indisputable that Mr. Farley competently managed the properties after the parties separated, and was able to generate thereby both a substantial income retained for himself and lesser amounts paid to Mrs. Farley for her personal support. While the exact amount of these support payments are disputed by the parties, they were by all accounts not negligible. Nonetheless, it is clear that Mr. Farley personally benefited to a far greater extent from the activities of Farley Management Company, reporting, for example, net taxable earnings of $217,385 in 1996. To the extent that Mr. Farley contributed, as he undoubtedly did, hard work, his management expertise, and business acumen to the marital enterprise, the trial court could have reasonably concluded that he had already been compensated for these contributions through his higher income. To the extent that Mrs. Farley received some benefit from the ongoing management of the rental properties, the trial court could also reasonably conclude that this reflected a normal return upon her capital interest in the property. Under these conditions, an equal division of the proceeds from sale is equitable.
We accordingly find that the trial court did not abuse its discretion in ordering that the proceeds from the real estate assets be divided equally between the parties. and Mr. Farley's fifth assignment of error is therefore overruled.
Mr. Farley's sixth assignment of error asserts that the trial court erred in awarding $30,000 in attorney fees, ordering that he pay this sum towards Mrs. Farley's accumulated legal expenses of over $100,000. The court based the award upon the disparity in earning potential between the parties, delays in the legal process imputable to Mr. Farley's "obstinacy," and his decision to serially employ, then discharge, at least four experienced domestic relations attorneys during the course of proceedings.
The domestic relations court may award attorney fees pursuant to R.C. 3105.18(H):
 In divorce or legal separation proceedings, the court may award reasonable attorney's fees to either party at any stage of the proceedings, including, but not limited to, any appeal, any proceeding arising from a motion to modify a prior order or decree, and any proceeding to enforce a prior order or decree if it determines that the other party has the ability to pay the attorney's fees that the court awards. When the court determines whether to award reasonable attorney's fees to any party pursuant to this division, it shall determine whether either party will be prevented from fully litigating [that party's] rights and adequately protecting [that party's] interest if it does not award reasonable attorney's fees.
An award of attorney fees by the trial court under R.C. 3105.18(H) will not be reversed absent an abuse of discretion. Rand v. Rand
(1985), 18 Ohio St.3d 356, 359.
Mr. Farley argues that Mrs. Farley has already paid the bulk of her accrued attorney fees, and therefore has not been prevented from litigating her rights. Mr. Farley also argues that he has no greater ability to pay the attorney fees than Mrs. Farley after transfer of the liquid assets as ordered by the trial court. Even if we accept these propositions by appellant, there is still a basis for the trial court's award of fees considering Mr. Farley's significantly higher earning potential as long as he retains control of the rental properties. The trial court was also in a far better position than are we to ascertain the extent to which Mr. Farley's conduct contributed to dragging out the divorce litigation and consequently caused higher fees for Mrs. Farley. Under the circumstances it was not an abuse of discretion for the trial court to make a partial award of fees to Mrs. Farley. Mr. Farley's sixth assignment of error is overruled.
We now turn to the five assignments of error raised in Mrs. Farley's cross-appeal.
Mrs. Farley's first assignment of error asserts that the trial court erred in imposing a definite termination date for spousal support premised upon a poorly defined and arbitrary event. The trial court's order provides as follows:
 Based on the long length of the marriage, the inequity in income, the long term previous support and the ages of the parties, the court ORDERS [Mr. Farley] to pay [Mrs. Farley] spousal support, in the sum of $1,500.00 per month. * * * Said support shall terminate upon the death of either party, the remarriage of the plaintiff, or the completion of the sale (and distribution of the equity to each party) of at least 50% of the joint marital rental properties. The 50% of joint marital property shall be defined and achieved as follows: Sale of the Fisher Road Property, or sale of five of the nine remaining joint properties. The court retains jurisdiction as to spousal support.
The general presumption in Ohio is that an award of spousal support, if appropriate, will terminate within a reasonable time and upon a date certain. Kunkle v. Kunkle (1990),51 Ohio St.3d 64, syllabus. "[A]wards of alimony for sustenance and support should be made terminable upon a date certain in the vast majority of cases wherein both parties have the potential to be self-supporting. Kunkle, at 68, quoting Koepke v. Koepke
(1983), 12 Ohio App.3d 80, 81. Kunkle did note, however, that exceptions should be made in cases "involving a marriage of long duration, parties of advanced age or a homemaker spouse with little opportunity to develop meaningful employment outside the home * * *." Kunkle, syllabus. The need of one party for, and the ability of the other to pay, spousal support are to be determined by the trial court with reference to factors enumerated in R.C.3105.18(C).
 (1) In determining whether spousal support is appropriate and reasonable, and in determining the nature, amount, and terms of payment, and duration of spousal support, which is payable either in gross or in installments, the court shall consider all of the following factors:
 (a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 [3105.17.1] of the Revised Code;
(b) The relative earning abilities of the parties;
 (c) The ages and the physical, mental, and emotional conditions of the parties;
(d) The retirement benefits of the parties;
(e) The duration of the marriage;
 (f) The extent to which it would be inappropriate for a party, because [that party] will be custodian of a minor child of the marriage, to seek employment outside the home;
 (g) The standard of living of the parties established during the marriage;
(h) The relative extent of education of the parties;
 (i) The relative assets and liabilities of the parties, including but not limited to any court ordered payments by the parties;
 (j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;
 (k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;
 (l) The tax consequences, for each party, of an award of spousal support;
 (m) The lost income production capacity of either party that resulted from that party's marital responsibilities;
 (n) Any other factor that the court expressly finds to be relevant and equitable.
In the present case, the trial court clearly recognized that disposition of the rental properties would both deprive Mr. Farley of the business which has provided his livelihood since the demise of Farley Paving and Farley Equipment and simultaneously transfer to Mrs. Farley amounts which should provide her with means to support herself. However, we agree with Mrs. Farley's contention upon appeal that making the termination of support automatic upon partial sale of the properties, particularly partial sale as defined by the trial court, is problematic. Keeping in mind that the support ordered by the court is largely premised upon Mrs. Farley's inability to access the asset represented by her share of the income rental properties, sale of five of the nine properties other than the Fisher Road property might not generate actual net proceeds available to Mrs. Farley to warrant termination of support, given the disparate value of various properties. Even were cessation of spousal support triggered by the sale of the Fisher Road complex alone, the potential remediation costs associated with the sale of the Fisher Road property render highly speculative any possible proceeds realized by Mrs. Farley. We therefore find that the appropriate award of support would be one of indefinite duration, with continuing jurisdiction in the trial court to later set a termination date based upon the same factors already considered in establishing the initial need for a spousal support order. Mrs. Farley's first assignment of error is accordingly sustained.
Mrs. Farley's second assignment of error asserts that the trial court abused its discretion by ordering spousal support in the amount of $1,500 per month, an amount asserted to be inadequate to meet her needs, and in awarding insufficient attorney fees to her. Initially we note that Mrs. Farley's brief upon cross-appeal presents no argument on the attorney fees aspect of this assignment of error, and that issue will accordingly not be addressed. App.R. 12(A); Hungler v. City of Cincinnati (1986),25 Ohio St.3d 338; Bank One Dayton v. Ellington (1995), 105 Ohio App.3d 13.
With respect to the amount of spousal support awarded, again, as with our discussion of the duration of support, the factors to be considered are found in R.C. 3105.18(C)(1), supra. The trial court decision contains a detailed and thorough examination of each of the statutory factors as applied in light of the facts of the case. Particularly stressing the relative income potential of the parties, the duration of the marriage, and the impending sale of the rental properties which would deprive Mr. Farley of his current source of income, the trial court set spousal support at $1,500 per month. A review of the evidence in the record and the trial court's analysis of the statutory factors reveals no abuse of discretion on the part of the trial court in its determination, and Mrs. Farley's second assignment of error is accordingly overruled.
Mrs. Farley's third assignment of error asserts that the trial court erred in not awarding interest on the property division and attorney fees. Mrs. Farley requests that the trial court modify the order to include interest on the $45,160 which the trial court ordered reimbursed from Mr. Farley to Mrs. Farley, representing his withdrawals from the money market accounts, with interest to accrue from the date of withdrawals. Mrs. Farley also seeks interest, starting on the date of the divorce decree, on the net cash surrender value of life insurance to which she is entitled, as well as interest starting thirty days from the date of the decree on the $30,000 award of attorney fees, and interest imputable to any delays by Mr. Farley in facilitating and effectuating the sale of rental properties.
These various items enumerated by Mrs. Farley present a variety of both pre-judgment and post-judgment issues and are not therefore uniform in terms of the applicable law. Furthermore, the state of the law in Ohio with respect to statutory interest awards on property divisions pursuant to a decree of divorce is to some extent unsettled. Mrs. Farley urges upon us application of the oft-cited case of Woloch v. Foster (1994), 98 Ohio App.3d 806,812, which applied Ohio's general pre- and post-judgment interest statute, R.C. 1343.03, and flatly stated: "An order distributing marital assets from one party to another has the force of a money judgment, and the recipient is entitled to interest on any amount due and owing under the order but unpaid." However, in Koegel v.Koegel (1982), 69 Ohio St.2d 355, the Ohio Supreme Court demonstrated considerable difficulty regarding applicability of interest to monetary obligations arising out of property division. "The different facts and circumstances which each divorce case presents to a trial court requires [sic] that a trial judge be given wide latitude in dividing property between the parties. * * * A property award without interest may sometimes be inequitable, but it is not always so. `This is why it is ill-advised and impossible for any court to set down a flat rule concerning property division upon divorce.'" Koegel, at 357, quoting Cherryv. Cherry (1981), 66 Ohio St.2d 348, 355. "We therefore decline to hold that a trial judge is obligated as a matter of law to mandatorily affix interest to those monetary obligations which arise out of a property division upon divorce. To do so would impose an unnecessary restraint on a trial judge's flexibility to determine what is equitable in a special set of circumstances."Id.
The court in Koegel, however, was addressing facts in which the amount owed under the property settlement was to be paid by the obligor spouse under a non-interest-bearing note at a future date. The court therefore specifically declined to rule on the general applicability of R.C. 1343.03 to divorce actions, because the statute is "applicable only to obligations that are due and payable, and the obligation here will not become due and payable until the occurrence of a future event." Koegel, at 358.
R.C. 1343.03, governing pre- and post-judgment interest in Ohio, provides as follows:
 Except as provided in division (C)(2) of this section, in cases other than those provided for in sections 1343.01 and 1343.02 of the Revised Code, when money becomes due and payable upon any bond, bill, note, or other instrument of writing, upon any book account, upon any settlement between parties, upon all verbal contracts entered into, and upon all judgments, decrees, and orders of any judicial tribunal for the payment of money arising out of tortious conduct or a contract or other transaction, the creditor is entitled to interest at the rate of ten per cent per annum, and no more unless a written contract provides a different rate of interest in relation to the money that becomes due and payable, in which case the creditor is entitled to interest at the rate provided in that contract.
Courts have, to a certain extent, struggled with the ambiguity of interaction between the above-cited authorities. As noted by one court, however, "the commonality of R.C. 1343.03,Woloch, and Koegel is that an obligation must be `due and payable' in order for a party to be awarded post-judgment interest." Downey v. Downey (Aug. 6, 1996), Mercer App. No. 10-95-18, unreported.
Of the four items asserted by Mrs. Farley to mandate an award of interest, the proceeds from sale of rental properties are clearly most akin to the property division in Koegel, since they are not only payable at a future date, upon realization through sale, but are incalculable at present with any certainty. Interest on division of the real property, therefore, even where limited to any delay caused by Mr. Farley, would be awardable only at the trial court's discretion under Koegel, rather than mandated by R.C. 1343.03. We therefore find no abuse of discretion on the part of the trial court in declining to order that interest be paid by Mr. Farley on this item.
The $45,160 money market account offset presents both pre-judgment and post-judgment aspects which will be considered separately. Although superficially a sum certain in the sense that it can be stated as an exact dollar amount accruing from a series of withdrawals on known dates, in fact this sum reflects only one item in the long balance sheet of the property division, and cannot be considered "due and payable" prior to being allocated as an offset by the trial court, upon the court's determination that the mutual funds and money market accounts should be divided equally between the parties. Interest prior to judgment on this amount was therefore fully at the discretion of the trial court, and did not fall within the mandatory ambit of R.C. 1343.03. Under the facts of the case we find no abuse of discretion in declining to award pre-judgment interest on this item.
With respect to post-judgment interest accruing on quantified amounts due and payable as set forth in the judgment, that is, the $30,000 in attorney fees, $45,160 money market account offset, and cash surrender values of life insurance policies as of the date of trial, the binding precedential utility of Koegel is less apparent, since that case limited itself solely to obligations not due and payable. In this respect, the sums owed under the decree of divorce fall within the ambit of Woloch,supra, which has been widely followed as requiring strict application of R.C. 1343.03 to mandate interest on amounts due and payable under a decree of divorce, to the extent that the amounts are calculable, due and payable. Dubinsky v. Dubinsky (Feb. 24, 2000), Cuyahoga App. No. 75403, unreported; Grant v. Donese (Aug. 6, 1999), Green App. No. 98CA 133, unreported; Boes v. Boes (June 17, 1998), Seneca App. No. 13-98-10, unreported; Brannon v.Brannon (June 27, 1997), Trumbull App. No. 96T-5572, unreported.
The above authorities are persuasive and moreover provide another incentive, above and beyond the traditional use of the domestic relations court's contempt powers as an incentive for the prompt and full payment of liquidated sums due under a divorce decree. We accordingly find that the trial court should have imposed post-judgment interest on certain sums due under the decree and upon remand the trial court shall modify its judgment so that interest shall accrue upon (1) the net cash surrender value of life insurance policies to which Mrs. Farley is entitled under the decree to accrue from the date of the decree; (2) the $30,000 award of attorney fees to accrue from thirty days from the date of the decree; and (3) the sum of $45,160 due Mrs. Farley as an offset on prior withdrawals from the money market funds by Mr. Farley, to accrue from the date of the decree. Mrs. Farley's third assignment of error is sustained to this extent, and in all other respects overruled.
Mrs. Farley's fourth assignment of error asserts that the trial court erred in awarding the entire value of Farley Equipment and Farley Paving to Mr. Farley. We find no error in this respect. It is clear from all testimony that the two companies are not currently functioning commercial entities, and have not been so for many years. What little value may persist in them consists of some residual equipment not yet disposed of by Mr. Farley, and perhaps some good will which, while still of some potential utility to Mr. Farley, would be of no value to Mrs. Farley. The assets of the companies are relatively insignificant in contrast to the other assets disposed of in the trial court's order, and it was not an abuse of discretion on the part of the trial court to award any residual value in the companies to Mr. Farley. Mrs. Farley's fourth assignment of error is accordingly overruled.
Mrs. Farley's fifth assignment of error asserts that the trial court erred in requiring Mrs. Farley to equally share the burden of the remediaton costs associated with the Fisher Road complex. Mrs. Farley asserts that, since Mr. Farley made the management decisions which led to the environmental hazards which presently encumber the property, he should solely bear the burden of remediation. We decline to adopt this reasoning. Any environmental situations which currently exist at the Fisher Road complex arose primarily as a result of the operation of Farley Paving at that site. Farley Paving was a family business which created much of the wealth in rental properties which the parties are now sharing equally. Mrs. Farley cannot now claim only the accretions to wealth devolving therefrom, while rejecting the liabilities associated therewith. The trial court's allocation of remediation costs to be shared equally between the parties was therefore not an abuse of discretion, and Mrs. Farley's fifth and final assignment of error is overruled.
In summary, in case No. 99AP-1282, Mr. Farley's assignment of error is sustained and the trial court's finding of contempt is reversed for lack of jurisdiction. In case No. 99AP-1103, Mr. Farley's first, third, fourth, fifth, and sixth assignments of error are overruled. Mr. Farley's second assignment of error is sustained to the extent that the trial court's decision insufficiently addresses the issues of division of the capital gain tax liabilities associated with the rental properties and responsibility for the Bank One line of credit. Mrs. Farley's second, fourth, and fifth assignments of error are overruled. Mrs. Farley's first assignment of error is sustained in that the trial court erred in fixing a termination date for the spousal support. Her third assignment of error is overruled to the extent that the trial court failed to award post-judgment interest as outlined above. The judgment of the trial court is affirmed in part, reversed in part, and this cause is remanded to that court for further proceedings in accordance with law and this opinion.
Judgment affirmed in part, reversed in part and remanded with instructions.
TYACK and McCORMAC, JJ., concur.
McCORMAC, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.
[1] Since the stipulations refer to eleven separately valued properties, and the court refers to nine properties other than the Fisher Road complex, it appears that the Fisher Road complex encompasses two separate parcels whose location and use, for purposes of disposition, are most conveniently treated as a single property. Any uncertainty in this respect does not materially affect the resolution of this appeal.